We will hear argument this morning in case 2297 TransUnion v. Ramirez. Mr. Clement? Mr. Chief Justice, and may it please the Court, the class certified here suffers from two fatal defects, the absence of class member standing and typicality. Each and every member of this class stands to collect thousands of dollars in damages, but the first inkling that many of them will have that they were injured will be receiving a check in the mail. The only thing that class members have in common is that they were sent their entire credit file in two envelopes rather than one and received a summary of rights only in the first mailing. But simply receiving all the requisite information in a non-compliant format is not enough to inflict a concrete injury. And Respondent fares no better on his claim that TransUnion failed to use reasonable procedures in preparing his credit report. Only 75% of the class never had a credit report, which is distinct from the credit file sent home upon request, prepared or disseminated during the class period. The Ninth Circuit reasoned that there was a material risk that a report could be prepared and disseminated, but there is no evidence that the risk ever materialized for over 6,000 class members, and yet they all stand to receive a sizable check. To be sure, Ramirez himself suffered significant injuries, but that just highlights the equally fatal typicality problem here. Ramirez had a credit report prepared and disseminated to a car dealer, was hindered in obtaining credit, humiliated in front of family members, and canceled a planned vacation. That makes him entirely atypical and unrepresentative of the average class member who simply received her credit file in two envelopes in the privacy of her own home. Ramirez suggests that only his legal claims need to be the same, but typicality means something different from commonality, and the typicality requirement precludes a class representative with wholly atypical injuries. A contrary rule would run counter to the basic promise that a class action is representative litigation and would violate the Rules Enabling Act to boot. Mr. Clement, could each of the class members have sued TransUnion before TransUnion removed the OFAC designation from their reports? I don't think so, Mr. Chief Justice. I mean, obviously, if this was a suit that was filed while the policy was still in place, we would probably be governed by the certainly impending standard of the Clapper case. And I think since the evidence in this case suggests that the average class member only had a 25% chance that their report would be disseminated, I think that probably means that they did not have a sufficiently impending injury. So I don't think it would matter if this were brought prospectively. Well, doesn't that seem a little odd? I mean, they're injured by having their report disseminated, but they don't want to take that risk on a report that might be disseminated. They just want to take that off to avoid that risk, whether it's 25% or 98%. I don't know why they don't have sufficient standing to at least clear that up. Maybe their damages aren't terribly significant if, you know, no one else has seen the report. But it's kind of a surprising thing that somebody with misleading information about someone, that the whole point is they hope somebody asks for it because that's when they get paid, and you can't do anything about it. Well, Mr. Chief Justice, what you can do about it and what the statute specifically envisions to deal with this situation is you can ask for a copy of your credit file before your credit report is ever disseminated to a third party. And the way the statute envisions this works is you get your credit file, you see the information that you believe is inaccurate or misleading, and then there's a process you can initiate to get it cleared up before it ever gets disseminated to a third party. Well, but they have no reason to ask for a credit report. You know, they've never bounced a check in their life. They've got perfect credit. Why would they even do that? Well, if they have no reason to think they have any problem, then I'm not sure how they would even know that they were suffering a risk of injury in a practical sense. But in all events, whatever the rule is prospectively, I think when you're talking about a retrospective action like this and a challenge to a policy that has been discontinued, then I don't think a risk really matters. I mean, if the risk didn't materialize, at that point, I think that's a cause to sort of break out the champagne, not to break out a lawsuit. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Clement, if one of petitioner's clients contracted to get the same OFAC designation information in a credit report and did not receive that in any reports over a period of time, would that client have standing to sue petitioner? Justice Thomas, I think that that client would have standing to sue because I think contracts are different for the following reason. Just by virtue of having a contract action, I think that means that you gave consideration in exchange for the promise. So I think when you think about a breach of contract case, you can think of the injury in fact being supplied essentially by the consideration that you gave up in exchange for the promise that people would do whatever they contracted to do, even if that was relatively trivial. Well, I understand that that's different from a private right that's in the statute, but I don't see that that difference or distinction between this makes any difference in both private rights. Well, I disagree with you on that, Justice Thomas. I do think this involves a classic public rights regime, and I think you can see that from the structure of the statute. This is not a situation where the statute gives the plaintiff a very specific private right to enforce a very specific promise, as in the contract. If you look at the enforcement provision, 1681N and O, gives the consumer a cause of action for any violation of this subchapter with respect to the consumer. And there's a hundred different requirements that are imposed on the regulated parties by the subchapter, which is the classic structure for a public rights regulatory regime, and that becomes unmistakable if you look at 1681S, which is the public enforcement provision of the statute, which equally gives the FTC the right to bring an action for any violation of a requirement of the subchapter, and they can even do that in front of the FTC itself, which of course is the hallmark of a public right. So I think this is a public rights regime. Well, I let that go for a minute. You know, maybe with the FTC, you're right. I don't necessarily agree with you as I suggested and spoke to you on the other part, but let's go. What would be your definition of your test for typicality? So I would start by saying that for typicality, the named plaintiff or the class representative has to have injuries and experience that are typical of the class. It's not just a matter of having the same claims. I think if you just laid down that rule of law, you would go a long way to sort of solving the problem. What would that leave for commonality and predominance then? Oh, I think they definitely have a role to play, but they're independent roles. I can have a common issue in a case, but I can still be a very atypical representative to litigate the common issue or even if that common issue predominates. So I think all three of those provisions work together in a complimentary fashion. Thank you. Justice Breyer. I'm interested in Justice Thomas's last question. Thinking of typicality, I mean, all of these plaintiffs, and respect every one of them in the class, they didn't in the first letter get all the information they didn't get about the terrorists related. And they said that the company didn't follow reasonable procedures, and they said in the second letter they didn't get the summary of rights. So they were all typical in that respect. But Ramirez also went out and tried to buy something and got into a lot of trouble. It was all complicated, da, da, da. So when the trial took place, would it have been possible for the lawyer for the company to have objected to the introduction of all that separate and special information about Ramirez on the ground that it had nothing to do and was prejudicial, it had nothing to do with the typical injury suffered by the class? So, Justice Breyer, I don't think that that would have been a proper objection to raise. And I think the reason is that, you know, particularly with respect to the reasonable procedures claim, what Ramirez would be testifying about is information that would be highly relevant in his own individual action. And I think the Rules Enabling Act doesn't allow you to fundamentally change the rules of the road when the person is testifying in a class action versus an individualized action. And so I think the right way to handle this problem is to pick a class representative who is, in fact, No, I know what you think is the right way. But I'm just wondering why in a class action where the individual who is the named plaintiff suffers a head injury and nobody else suffers a head injury. And he wants to introduce that because it's something to do with the injury. You know, it's a relationship. But can't you object to that? Why not? You say, look, that might have been OK in an individual action to bring that in. But this isn't that. This is a class action. Let's stick to what the class action harms were. Why can't you say that? Well, I don't think that's the right way to do it. And you can't do it in part because of the Rules Enabling Act. I don't think the evidence that comes in as to the named plaintiffs is supposed to be fundamentally different. But if you look at the Ninth Circuit brief that my friends on the other side filed, they specifically said they needed to put forth the experiences of Ramirez at the Nissan dealership in order to lay the foundation for all of their claims, the reasonable procedure claims and the disclosure claims. Thank you. Justice Alito. Class members whose information was disclosed to third parties certainly had reason to worry about that, wouldn't you say? Well, yes or no, Justice Alito. I don't mean to resist it, but I think given that we know that roughly 1,500 people had their reports disseminated and nobody other than Ramirez complained, I do think there are a lot of people in this class who had it disseminated and maybe the person on the other end took a quick look at the birth dates, saw that they were radically different, went ahead with the transaction, kind of no harm, no foul. Well, is there really no harm? Suppose someone gets this information, asks for the credit report, gets the information, and sees that the person has been flagged as someone whose name resembles the name of a person who's on this list. Doesn't that inflict some psychological injury on the person who gets that information? I don't think so, Justice Alito. I read a report that late Senator Kennedy ended up being on the no-fly list or some list associated with the no-fly list for secondary screening. I think he managed to get it cleaned up, and I'm sure it was a little bit of an inconvenience for him to be on the list, but the bare fact of knowing that you're on a list or share a name with somebody who's on a list, I don't know that that really is injury in fact. Of course, even if it is, that's only 25% of the class. All right, let me shift to a different subject. If we were to agree with you, and this is an if, that the district court should have certified only a narrower class, only those whose information was disclosed to third parties, can that be remedied simply by precluding recovery for those not in the class, or did that possibly overbroad certification hurt your client in some other way that can't be untangled? I think it did hurt my client in ways that can't be untangled. I think it may have even prejudiced the plaintiff a little bit, given that the jury may have sort of thought about the size of the class in making the award. It's a little hard to completely unpack it. In what ways might it have hurt your client, or did it hurt your client? Well, the jury did hear evidence that suggested that we did this to thousands of people, when that's actually not the case based on the premise of your question. So I do think that's quite prejudicial to us. There's also sort of the theoretical problem that I'm not sure that when a court proceeds on the assumption that it's exercising jurisdiction over all the absent class members, that you just sort of at the end say, well, never mind. We'll just sort of fix that by sort of sticking this for the 25%. I would also just add, we don't think that Mr. Ramirez was typical, even as to the 25%. So we think because of the typical. I'm going to time this up. Thank you. Justice Sotomayor? Counsel, I read Rule 23A3 as requiring typical claims and defenses. Mr. Ramirez's claims were not subject to any unique defenses, and they were identical to every class member's claims. Everyone in the class was designated a potential match with someone else on the OFAC list because of the same unreasonable process. And everyone received the same two mailings in response to requests for their credit files. Now, you object to Mr. Ramirez's atypical harms or potential individual damages, but I don't see where Rule 23A3 requires typical damages, number one. So how do you square your argument with the text of the rule? Number one, I don't think that's a good argument. But number two, when you raise this issue before the district court, it suggested a verdict form that would let the jury award different statutory damages for class members who experienced different harms. That seemed like a very reasonable way to handle the situation. But TransUnion didn't ask for such a form. It didn't object to Mr. Ramirez's testimony or seek discovery for absent class members. I just see this as a trial error, not as an error in certifying the class. And the trial error was invited by you, not by you personally, but by counsel below. So, Justice Sotomayor, let me respond to both pieces of the question. First of all, I think textually on Rule 23A3, it requires the claims and defenses to be typical. I don't think it answers the question of whether that means that with respect to the claim that needs to be typical, you look at the jury's elements. Well, don't you think that this is a typical claim, meaning this is exactly what this law was intended to avoid? He's as typical a claimant as one could imagine with respect to the law at issue. This is exactly why the law was passed, to protect people from exactly this situation, the situation he faced. With respect, I don't think his claim is typical of the claim of the average class member. I mean, I would liken it to if my fingernail was broken, and I represented a class of people with broken fingernails, but my fingernail was broken in the process of having my hand mangled, I don't think I have a typical claim. I don't think I'm a typical class representative. And I think you would say that textually by saying my claim is different. It's not typical. It may be the same legal claim, but it's not a typical one. And typicality asks for something more than commonality. As to the trial error, with all due respect, I think if you look at the – we actually proposed a jury form that allowed the jury to say that with respect to the statutory damages, you couldn't find that every member of the class was entitled to statutory damages. It was Ramirez or no one, and under our proposal, you can't say one or all. That was rejected. And throughout this case, the other side was the one saying that we can just get one number for the statutory damages award, and that's why individualized damages don't predominate. So I don't think this was a trial error, with all due respect, and we certainly propose – Thank you, counsel. I've run out of time. Thank you. Justice Kagan? Mr. Clement, suppose that there's a carcinogen, which when it is in your drinking water, you have a 50% chance of getting cancer. And suppose Congress passes a law that everybody exposed to that carcinogen can sue and obtain statutory damages. And suppose that there's a class action of people exposed to that carcinogen. Does that satisfy Article III? I think that probably would, Justice Kagan, but if this were a weird carcinogen that worked in such a way that like a year later you could tell whether you were in the 50% risk or the 50% safe category, and then you sued for statutory damages retrospectively on behalf of the people who averted the risk, I think you might have a different result. So that's interesting, Mr. Clement, because that takes us back to the question that you and the Chief Justice were talking about. Now, in my hypothetical, unlike with the Chief Justice's question, you agree that retrospectively there is standing, right? So if you just, you know, you're within a five-year period, let's say, nobody knows who's going to get cancer, you're agreeing that everybody could be in that class action and that there would be standing, correct? I think so, Your Honor. I mean, just to be clear, I think so because I think a 50% exposure to cancer when you haven't figured out whether or not you are going to get it because of the exposure, I think that's an injury. In fact, under, you know, the common law, it would probably be the kind of thing that… Okay. Well, now let's suppose that this cancer works so that you either get it or you don't in five years. And let's say that this suit is brought in the sixth year, still within the statute of limitations that Congress has prescribed, and it's still the same class. There are both people who have gotten it and there are people who haven't gotten it. Now, I would have said that if you're willing to give me that everybody has standing within the five years, it should be that everybody has standing in the sixth year as well because you have standing if you suffered harm in the past. And your concession is a concession that you have suffered harm in the past, isn't it? No, I don't think so, Justice Kagan. But let me add one thing to the hypo to try to explain why I'm taking the position I'm taking. I'm assuming that the people who are suing in the sixth year, like they didn't even really know about the exposure until they found out they were in the clear because that's this case. And those people, I think, don't get to recover. I mean, even though they could have recovered in the fifth year, even though they didn't know because Congress said that they should get to recover, regardless of their state of knowledge. But even in the process of filing the lawsuit during the five-year period, they essentially would know. And so I think if you were sort of subject to a risk that you didn't even know about and the risk never materialized, at that point, I don't think you can bring a retrospective action for damages. I mean, it seems as though it's a material risk of harm in the language that Spokio used, no? In your hypo, it might be, but that's in part because it's 50% and it's chancer. And I think, you know, I don't want to go all learned hand on you, but I think you should think about both the risk and the consequences. Thank you. And I think as it's here, I'm sorry. Justice Gorsuch? Mr. Clement, why don't you go ahead and finish your answer? I'd be curious. Thank you, Justice Gorsuch. What I was just going to say is that, you know, here you have a 25% risk based on the information in the record. And then the consequences of that for everybody other than Mr. Ramirez have not been anything like getting cancer. In fact, nobody else has registered essentially any complaints about what happened to him and being denied credit. Is it that there's no material risk that these people face? Or is it that they didn't know about it? Which is the key to your argument in response to Justice Kagan? I don't want to evade the question. I think it's the combination of the two. But just to be clear, if you ask me did people in this class suffer material risk, I would say no, not a material risk. Because materiality has to take into account the consequences. And given that no one other than Mr. Ramirez is subject to any consequences, I don't think it's a material risk. I also think if you're thinking that, you know, well, maybe it's not like the risk of injury so much it is sort of a fright that you might have, like a common law near battery or something like that, that requires knowledge. So, okay. So your argument, as I understand it, then, is with respect to those in the group that didn't have their information sent to third parties, that they need to have some knowledge of the information in order to have any material risk of injury. Is that a fair summary of what you're saying? I think it is, Your Honor. The only thing I would add is I'm thinking that, you know, the other side's trying to argue that what makes the material risk in injury in fact here is at least in part the idea that it would kind of, you know, ruin your whole day. You would be obsessed about it, concerned about it. That requires some knowledge of it in order for you to suffer an injury in fact. In order to have emotional distress, you have to have knowledge of the thing that will cause the emotional distress. Exactly. The other side, not me, with all due respect, has to have a theory as to how the material risk translates into an injury in fact, unless you think that a material risk just standing alone is an injury in fact. And if you think that, I think it's got to be a lot higher than 25%. Okay. And then with respect to the 1800 who did have their information published, when I look at, you know, the common law of defamation, publication was presumed to give rise to injury. The idea of if something bad is said about you in public, the common law would presume an injury. Why wouldn't the same hold true here? Well, I think, Your Honor, the key thing is, and, you know, I can try to quibble about whether it had to be defamatory per se or false, but here I don't think what is actually published is in fact false. Because if you go to the OFAC website today and type in the respondent's name, you will get a hit. So what was communicated is this name is a potential match to somebody with the same first name and the last name on the OFAC. I got it. My time has expired. At some point, though, if you get a chance, if you could assume that it's substantially false, then what? But I'm afraid my time has expired. Justice Kavanaugh? Thank you, Chief Justice, and good morning, Mr. Clement. To pick up on Justice Gorsuch and Justice Kagan's questions, let me make sure I understand the risk of harm. As I read your brief, you said the risk of harm alone is likely not enough for damages as opposed to injunctive relief. At least that's how I read footnote four of your brief. In response to Justice Kagan and Justice Gorsuch, I think you were saying, but tell me if I'm wrong, that the risk of harm is still not enough for damages unless the risk of harm is itself a separate harm. In other words, the risk of harm is not cancer. In other words, you don't have the cancer, but the risk of harm may create emotional injury. Is that an accurate way to summarize what you're saying? I think that's right, Your Honor. And I guess the only other thing I would add is I suppose there might be certain risks of harm that are so high that maybe you think that the material risk is itself an injury in fact, even if it doesn't manifest itself in emotional harm or some other injury in fact. But I don't think that's 25 percent chance of a dissemination of a credit report. Even for damages claims? Even for damages claims. But as you said at the outset, I do think the footnote four point is very important, which is whatever your risk was ex ante that might have been enough to get injunctive relief to stop a practice, if you're in the 75 percent that were fortunate and didn't actually suffer an injury in fact because the risk didn't materialize, I don't think you have injury in fact at that point. To pick up on Justice Alito and also Justice Gorsuch, if we agree with you on the 6,332 people but don't agree with you on the 1,853 people, exactly what should we say in terms of what should happen on remand? So I would say that what you should say on remand is that the courts below should decertify the class. Because remember from the very beginning we said the reason you can't have a class here is because the issue of injury is not common to the class. And so I think you'd essentially be vindicating the point. And I think it's also worth recognizing that I think what you'd be saying about the 6,332 is not that they absolutely positively don't have injury. It's just you'd be saying if they have any injury they've got to come in and show it individually. And that just underscores that this class of 8,000 plus was wrong from the beginning for the reasons that we pointed out from the beginning. And then in response to Justice Thomas, I think you're saying that the problem here is that Congress is setting up in essence a shadow government of private attorneys general to enforce prohibitions on certain activities by certain entities. And that's an Article II, Article III problem. And your test is no harm, no foul. But how would you succinctly describe how we determine whether there is sufficient harm as a general matter or can that be done in a general way? I'm not sure that's capable of generalization. I just think you do have to have – the best I can do would just be to repeat what I think is the gist of the Spokio decision, which is you need injury in fact. Injury in the law won't do it. And then the one thing I would add, and I think this speaks particularly to people that are focused on the public rights, private rights distinction, when you have a statute like the one at issue here or like the one at issue in full where the structure of the statute is to give certain individuals, whether they be consumers here or planned participants in full, a right essentially to enforce any violation of the subchapter, that is a strong indication that Congress has not actually made the judgment that this is a very specific private right. Thank you, Mr. Clement. Sure. Justice Barrett? Mr. Clement, I want to ask you a follow-on to Justice Kagan's hypothetical about the people who drink water exposed to a carcinogen, they're at 50% risk of cancer. She asked you to distinguish between what would happen if they filed within the five-year period in which they would know whether the risk had materialized or outside the five-year period, say in the sixth year. I want to know what would happen, say, if they filed in year two, but the litigation drags on and on and on, and the case doesn't come to its conclusion until year six. So if I understand your response to Justice Kagan, it would essentially mean that people had standing at the outset of the suit, but if they were in the 50% that were home free, they would lose their standing by the end? I mean, that just seems like an odd way to think about it, since we normally judge standing at the outset, and when something dissipates over the course of a suit, we think about it in terms of mootness, not that the injury isn't concrete. Or is this a merits determination, that they didn't suffer damages? How to think about that? Well, I think you probably would in your hypo, which is a little different from every other hypo I've gotten. I think mootness might be the right framing, and I also think you're probably right that at that point in the case, they would probably also lose because they wouldn't be able to sustain their cause of action at that point. The only thing I would add, Your Honor, is this court has made very clear in cases like Lujan that you do have to maintain your standing at every stage of the case, and so in your hypo, I think what happens is just sort of a clock runs out on the injury, but if the evidence that ultimately emerges at trial makes clear that as to a discreet group of people, a risk absolutely positively did not materialize, I do think you could say at that point, based on the evidence in the record at that juncture, that they don't have standing. Okay, let me ask you about material risk of harm. So as I read Spokio, and it cites Clapper after that language, it preserves the possibility of standing in a prospective suit where harm is imminent but hasn't yet happened. And then for slander per se, there are some harms that were recognized at the common law, as we've discussed during this argument, that were presumed to cause harm because even if you didn't have to prove that you lost a job over it, and the risk was so great that in and of itself the common law tort proposed it, it seems like this case is about whether even going beyond that, the big risk that the tort would actually happen to you is itself a tort. And I haven't heard you disclaim that as a proper reading of Spokio. Instead, it seems like you're talking about quantifying the risk, accepting that that could be an injury under Spokio, but only if it's an 85% or 90% chance of happening. Am I understanding you correctly? I think you are, Your Honor. But I guess I would take this opportunity to sort of disclaim the idea that just, you know, a pure risk of injury, you know, a real risk of injury, you know, in and of itself without any link to some emotional injury or a property right of the type that I think you would have, you know, it might be one way to understand the defamation cases. I don't think that gets it done. I mean, you know, at the point that you, you know, there's a real risk that you might be injured, but you're not injured, I guess the way I see that is you're not injured. Okay, so you're talking about a distinct injury that precedes it, like emotional distress. Sure, and that's why I got into the discussion about sort of whether you know about it, because obviously, you know, I think if you don't know about it at all, then you can't be distressed about it, and so you can't suffer the injury in fact, whereas there's certain injuries, you know, somebody trespasses on my property, and I find out later, but at the time I had no idea. I'm going to have to stop you, Mr. Clement, because I'm out of time. Thank you very much. A minute to wrap up, Mr. Clement. Thank you, Mr. Chief Justice. In the end, there's no getting around the two fatal flaws with the class certified here. The district court recognized from the outset that proof of an actual de facto injury would require individualized proof and refused to certify certain state law claims on that ground, but he excused the class from making an individualized showing of de facto injury for the FCRA claims because Ninth Circuit law did not require it at the time. But under any proper understanding of Article III, each class member must have injury in fact, and this class must be decertified. Decertification also follows because Ramirez is a radically atypical class representative. He suffered serious injuries that would have allowed him to seek actual damages in an individual action, but instead he sought statutory damages at the top of the range, plus punitives, for a class that shared few of his experiences. Rule 23's typicality requirement guards against just that kind of abuse. The objections were repeatedly raised and rejected below. The certification order cannot stand. Thank you, counsel. Ms. Reeves? Mr. Chief Justice, and may it please the court. In Spokio, this court discussed a number of considerations that are relevant to whether a violation of a statutory right constitutes a concrete injury, all of which point the same direction here. The class members have standing to bring reasonable procedures claims. By placing OFAC alerts on all class members' consumer reports, petitioner created a real risk of harm, that they would be denied credit, employment opportunities, or other benefits because they were wrongly labeled as potential matches to a terrorist list. That is precisely the type of harm that Congress sought to prevent by adopting the reasonable procedures provision and defamation provides a common law analog. Congress also gave consumers rights to receive certain disclosures and summaries of their rights, and under this court's informational standing cases, all class members have standing to bring claims for violations of those rights. But because Mr. Ramirez suffered atypical injuries, there is a significant question regarding whether Rule 23 was satisfied, and the court should vacate and remand on that basis. I welcome the court's questions. Ms. Reeves, putting aside the typicality questions, how, if any way, is your position different from that of the respondents? I think we view informational standing as providing the best basis for the second two violations that the class alleged in this case, that is the summary of rights violation and the disclosure requirement. We don't think the court needs to go through the multi-step factor process that laid out in Spokio when considering those two. And I think, in addition, we look at a few different factors when considering the reasonable procedures requirement. We don't really focus on potential of any emotional distress, but look at just the risk of dissemination of these class members. And similarly, we haven't taken a position on whether there was third-party publishing because of the activities that TransUnion engaged in within its own organization or with its third-party vendors. You said in your opening that the class members were wrongly labeled potential matches to the OFAC list, but I don't see how that's true. They were potential matches, right? They had the same name. Potential doesn't mean actual, and I don't see how it can be actionable if they were accurately labeled potential matches. Mr. Chief Justice, a couple of responses to that. First of all, the statute doesn't require a showing of actual falsity. It requires consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy. And one thing that's going on in this case is Petitioner has conflated, in a lot of ways, the standing and the merits arguments here. So under Spokio, we have to look at whether that's a type of harm that Congress could legitimately identify. I think I've got that. What was your second point? The second point is I think it's a stretch to say that that's not wrong. A mere first and last name match isn't matched to a first and last name on another list, but it's not a lot different than saying that John Smith and John Wayne are a potential match, just because they have the first same name. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, just so I understand, are you saying that the district court abuses discretion in certifying the class here? We haven't quite gone that far, Justice Thomas, but we do think that the courts below viewed typicality through the wrong legal framework, and that may have resulted in an improper certification of the class, but we haven't taken the position that it was certainly an abuse of discretion. But if there isn't an abuse of discretion, on what basis would we send it back? So we think that the courts below did apply an incorrect legal framework, but we're not sure that the ultimate outcome was incorrect, and so we think that the basis the court would send it back would be to say that this was the wrong typicality framework. The court of appeals and district court should have considered the guidelines that we've suggested in our brief that we think are tied to the legal standard, that a claim or defense be typical, and that the lower court should reconsider this in the first instance because there are open questions as to forfeiture and what petitioner and respondent did and did not agree to below. So do you think that there's anything other than the level of harm? What is atypical about this claim? Mr. Ramirez's injuries are atypical, we think, and a claim is not necessarily defined as just the elements that an individual needs to prove. Black's Law Dictionary, when it defines claim, includes the relief that's requested. And so a claim can consider the injuries that result from an individual's experiences, and while the defendant's actions may have been the same as to everyone, the plaintiff's experiences might have some impact on what is and what is not relevant for the purpose of proving a claim. Thank you. Justice Breyer? I have the same question, just if you'd want to say more about Justice Thomas' last question. How is this different? I've always thought that a class of antitrust plaintiffs, all of whom have to pay higher prices as the result of price fixing, could be represented by a consumer who, through an odd chance, bought a thousand times more of the product than anyone else in the class. He just had higher damages. Or a class action against somebody for doing something that would send a victim to an emergency room could be represented by a person who was not only sent to the emergency room, but through an odd set of circumstances was actually sent to the operating room, and had to be, and had all kinds of bad. It's the same basic harm, it's just a lot worse. Well, how does this differ from that? In the examples I gave, are they not typical? Or is the defendant allowed to say to the judge, Judge, don't take those non-typical things into account, the extra damages, at least not until we find liability, then you can have a class for damages. Or don't consider, I mean, how does it work? A couple of responses to that, Justice Breyer. I think as to the two hypotheticals you gave, the first hypothetical, the antitrust plaintiff, there might not be a typicality problem there because any differences would be easily calculated. And the court could consider that at the outset of the case and determine whether there's a viable damages model to separate different individuals out, just based on kind of a mechanical, mathematical calculation. I think the second example that you gave, which kind of is a liability type example, in actuality, a lot of courts don't allow product liability type cases to proceed as a class because individualized damages tend to make the named plaintiff not typical or run afoul of other Rule 23 considerations. And here, in the statutory damages context, the jury is charged with setting the amount of damages within a range. And plaintiff-specific experience can be relevant to that. So in a situation like this, where one individual, the class plaintiff, was placed on the stand and gave extensive testimony about his specific experiences, we think that there can be typicality problems there because that isn't indicative of what happened to other class members. And they might benefit from that in a way that they really shouldn't. Justice Alito? In Spokio, the opinion says, quote, not all inaccuracies cause harm or present any material risk of harm. Do you read that as saying that there is injury, in fact, whenever there is material risk of harm? Do you read that as setting out a legal test for injury, in fact? I don't read that as alone setting out a legal test for injury, in fact. I think the court in Spokio set out a number of considerations that may be relevant to injury, in fact, when Congress defines a harm, one of which is Congress's judgment, another which is whether there's a common law analog for the harm, and another of which is whether there was a material risk of harm, which might be necessary in some cases, but not in all. Yeah, Spokio's discussion of harm is quite clipped, and it's potentially subject to different interpretations, but let me shift to something else and ask about the class members standing to assert claims for failure to provide the information called for by Congress. Mr. Clement says all the information was actually provided, but it was just provided in the wrong form. You may not agree with that, but is it your position that there is always injury, in fact, when information that Congress says must be disclosed in a particular form is not provided in that form, but is provided in another form, and the recipient is well able to understand the information that's provided? That's not our position, Justice Alito. The informational standing cases that we rely on here rely on a denial of information that is statutorily required to be provided, and what you've just described wouldn't be a denial of information. And so if there's a statutory formatting requirement, that would kind of probably be back in the more general Spokio analysis where we have to look at the various factors that Spokio lay out. Thank you. Justice Sotomayor? Counsel, do you think that everyone in this class is entitled to some measure of statutory damages? Yes, Justice Sotomayor. All right. So really the issue is how much for each class member, correct? That is correct. All right. And what I'm having a problem understanding is how Mr. Ramirez is not typical with respect to the legal claims. His legal claims are identical to everybody else's, right? The failure to have reasonable procedures in place and the erroneous disclosure, correct? His claims are the same. All right. Now, if you would just walk with me, okay? He's the same in terms of every other class member as the statutory damages. And what you say, I think, is that he may be atypical with respect to the amount of statutory damages to which this particular type of harm would be entitled. Am I correct? That's correct. But why isn't that a trial issue? And why is that an issue for 23A? Wouldn't that be a predominance requirement under 23B3? So, Justice Sotomayor, let me try to answer the couple of questions that you have in there, starting with the last one, which is whether this is a typicality problem or not. While I would agree, and this Court has repeatedly said, that there's overlap between typicality and predominance and commonality, here it does seem that this problem fits best within the typicality bucket, and that's because typicality focuses on the named plaintiff and his claims, whereas the other requirements, commonality and predominance, focus on all the class's claims in a broader way. And getting to the second kind of point, I think that this is not a trial issue,  and I think that the defendant's claim is that she or he meets the requirements of Rule 23, and this may have to be done by an evidentiary showing at the outset of a case. So it's not as if that isn't sufficiently done. It's the obligation of the defendant to try to fix any typicality problems that were introduced. Thank you, counsel. Justice Kagan? Mr. Hughes, I guess I'm not quite understanding your typicality argument, because you just said it wasn't a trial issue, but in answering Justice Breyer, you said that the problem was that Mr. Ramirez had testified at trial. So I guess the question that I have is, suppose he hadn't testified at trial, would there still be a typicality problem? I think it's very likely that there would not be a typicality problem in that situation, and that's because a plaintiff is the master of their complaint and the master of the case that they put on at trial. Well, it's a little bit odd to me to say that there wouldn't be a typicality problem in that situation, but still it's a problem that's about class certification, because Mr. Ramirez could have brought this case as a class representative and not testified at trial, or alternatively, he could have had somebody else testify at trial, a different member of the class. I mean, there's no necessary relationship between who's the class representative and who testifies at trial. I mean, still a third alternative is that Mr. Clement's client could have called a bunch of other class members to testify at trial. The question of who testifies at trial really has nothing to do with who the class representative is, does it? Not necessarily. You're correct as a matter of trial management that the named plaintiff wouldn't have to testify, but that doesn't absolve courts of the requirement to find out whether a putative named plaintiff is, in fact, typical. I suppose it's sort of a mismatch, your argument and your conclusion. Suppose that there were a different class representative. It wasn't Mr. Ramirez. It was a class representative with a perfectly typical injury, but then he said, I have this great idea. Let's put Mr. Ramirez on the stand. I mean, he could do that. There might be some evidentiary objection, but it wouldn't be a class objection, a class certification objection. So, again, the problem has nothing to do with class certification, does it? I disagree, Justice Kagan. I think that what you just described, a class member who's not a named plaintiff testifying to radically atypical injuries, that wouldn't be a typicality problem, but it could be a predominance or a commonality problem. Here, it's a typicality problem because it was the named plaintiff, but as this court has laid out in cases like Dukes and Falcone, a plaintiff has to bear the burden of proof of demonstrating that they meet rules. Thank you, Ms. Rivas. Thank you. Justice Gorsuch? Good morning. I want to return to Justice Alito's last question. I'm not sure I captured your answer. So, Congress has a statute that says notice needs to be provided in a particular form. The defendant provides it in a different form. Is that alone enough to create an injury in fact under Spokio, or do you agree that something more needs to be shown, some risk of harm, some actual harm, something befell the plaintiff because the form of the information was different? Justice Gorsuch, I want to be clear on this here. We think that a difference in form wouldn't fall under informational standing, per se, and thus would end up under Spokio. And in that instance, a court would need to look at Congress's judgment, whether there was a common law analog, and whether there was a material risk of harm. So something more than a mere violation of the statutory form of notice? I think that's likely there would not be harm there, although I'm obviously answering in the complete abstract about any statute. Okay. All right. Thank you, counsel. Justice Kavanaugh? Thank you, Chief Justice, and welcome, Ms. Reeves. On the risk of harm, I want to make sure I understand your answer. My understanding was that a risk of harm that is not itself a separate cognizable harm does not give you standing to seek damages as opposed to injunctive relief because you haven't been harmed. Is that wrong? We disagree with that, Justice Kavanaugh, in that I think what this court suggested in Spokio is that in certain instances, a risk of harm alone can be enough to provide Article III standing. And an example of that from the common law is libel, in which the common law would allow a recovery of damages even if harm never actually materialized. Well, because there's been publication, though, so there's been some kind of reputational injury. No? That's part of defamation, but I don't think this court suggested in Spokio that we're forever limited to the types of common law harms that have only explicitly been identified. And then to see how you see this case fitting into the separation of powers more generally, I think Mr. Clement is suggesting, and certainly the amicus briefs are suggesting on his side, that Congress is in essence delegating the private attorneys general to enforce federal law against a wrong committed by someone to try to deter that wrongful behavior. And some of the amicus briefs say the problem is that the executive branch enforces federal law and that private plaintiffs can't do that, can't be delegated that authority by Congress unless they themselves have a concrete injury. Do you disagree with any of that? I disagree. I think that suggesting that because this law can be enforced by the FTC, that that suggests that it can't also provide some individualized concrete rights. And specifically looking at the rights that are at issue here, the cause of action provides the cause of action when there's a statutory violation with respect to any consumer. And what we're talking about here are mistakes made with an individual's consumer report about his or her own information. I just don't think that's a violation of executive power or prosecutorial power when it's an individual's right that Congress has given to that individual. Thank you. Very helpful, Ms. Reeves. Thank you. Justice Barrett? Good morning, Ms. Reeves. I have a question about informational injury. So Adkins and public citizen arise in the context of FOIA and a right to information from the government. A lot of the courts of appeals who have recognized this idea of informational injury in the context of information to which a plaintiff is entitled from a private party also rely on Haven's Realty. You don't. Why? Justice Barrett, while we didn't cite Haven's Realty in our brief, we do think it is relevant to the informational standing inquiry here. Can you describe a little bit more? Because it seems to me that Haven's Realty, the harm there is discrimination, not deprivation of information. And since it's kind of an obvious site, since those are the three cases that the courts of appeals relied on, I was surprised not to see it there. Do you think Haven's Realty is distinguishable? I don't think it's distinguishable from this case, and I think it's helpful because while it was against the backdrop of discrimination, the court there found that the Fair Housing Act conferred on all persons a legal right to truthful information. Let me switch gears for a second and go back to Adkins and public citizen. If in those cases those who were seeking information had said, we want the information, we filed the FOIA request, we have no plans of even opening the envelope with the information if you provide it to us, would they have had standing then? I think it's certainly a closer question, but I don't think that informational standing, as this court has viewed it, requires, I should say it solely requires the denial of information to which someone is entitled under Article III. And why is it a close question? If the plaintiffs in those cases had disclaimed any intent to use the information or even look at it, why under your theory isn't it a straightforward yes, they had informational injury and therefore standing? I think the answer is yes. I think it's closer just in that it might touch on the concreteness just a little bit, but at the end of the day, the denial of information alone is enough, and we think those cases are bad to spread that way, and we think what happens here is also best seen as the denial of information, regardless of the fact that there's not proof potentially relative to individual class members about having opened the envelope. Thank you, Ms. Reeves. A minute to wrap up, Ms. Reeves. Thank you, Mr. Chief Justice. While we've discussed a number of hypotheticals today, it's important to keep in mind the actual claims here. On these facts, the various spokio factors all cut in favor of finding standing for the reasonable procedures claims. The OFAC alerts were inaccurate as to a material issue, whether a party making a contracting decision could lawfully contract with a consumer. And there was a substantial likelihood that all class members' reports with the alerts would be disseminated to third parties. Petitioner's business model depended on dissemination. Petitioner made the reports available at a moment's notice, and Petitioner had a high dissemination rate. Congress made a clear judgment to protect consumers in this situation, and nothing in Article III prevents Congress from doing so. This case falls on the standing side of the line, regardless of what hypothetical cases involving other statutory provisions and other facts might come out. And the disclosure and summary of rights claims fall squarely within this court's informational standing precedent. But given the typicality issues, the court should vacate the decision below and remand the case. Thank you. Thank you, Counsel. Mr. Isaaceroth? Thank you, Mr. Chief Justice, and may it please the Court. Congress recognized both risks and benefits inherent in centralizing massive amounts of private credit information. It gave credit reporting agencies broad preemptive protection from court liability, but also the responsibility to ensure accuracy and to follow specific procedures to enable consumers to challenge misreporting. Nothing in Article III restricts Congress's power to create those rights. The class alleged and proved invasion of particularized statutory rights granted to them, not the general public. The common law has long recognized the concrete interest in economic reputation and afforded an inferred remedy without proof of actual damages. TransUnion created an explosively high risk of harm by placing OFAC designations, not in the secretive desk drawer, but in the readily accessible credit files of innocent Americans. As the SG argued, TransUnion's business was the dissemination of information to third parties. No dissemination, no profit. Both courts below found the claims asserted were the same for all class members, following the text of Rule 2383. Mr. Ramirez's accuracy claim stems from TransUnion's systemic failure to ensure accurate OFAC reporting, and his disclosure claim stems from the same two non-FICRA-compliant letters sent to every class member. All class members sought statutory damages based upon the same willful misconduct of the petitioner.  Being labeled a potential OFAC match is not a misreported zip code. It is the scarlet letter of our time. It banishes individuals from the marketplace. It is thus staggering that since 2002, the petitioner could not identify a single correct OFAC match, despite issuing thousands of OFAC alerts a year. This is not Luke-Honor-Clopper, not an attempt to constrain other branches, but of honoring a statutory scheme. Thank you, Your Honor. Thank you, Counsel. Let's suppose that Congress creates a cause of action for statutory damages for anyone driving within a quarter mile of a drunk driver. You were driving within a quarter mile, but you didn't know it until a few days later. Based on a highway camera, you got notice and it told you about the statute. Can you bring an action under that statute? I believe you could bring an action under that statute. The question would be whether you were harmed at all. Spokio runs the inquiry about the risk of harm together with the scope of the congressional interest. At that point, you would have a marginal case, Your Honor. So you're saying that you would have standing to bring that suit? Yes, Your Honor. In footnote 6 of Lexmark, the court distinguished between proximate causation and standing inquiry and suggested, as in cases like the hypothetical before me, that the better approach might be to dismiss this under Trombley or Iqbal or for summary judgment, but that it confuses the statutory cause of action to address it in jurisdictional terms. Well, but Spokio also said that Article III standing requires a concrete injury even in the context of a statutory violation. What is the concrete injury in my hypothetical? You didn't know you were exposed to risk, but you didn't know it, and by the time you found out about it, you weren't. I think Mr. Clement said, you know, you should be breaking out the champagne or talking about how lucky you are, not how much you've been injured. Your Honor, I think Spokio addresses the question of material risk and does not do so in terms of your subjective knowledge. And so the question is whether there was material risk of your being harmed and whether Congress sought to deter parties from engaging in that material risky behavior by creating a cause of action. Justice Thomas? Thank you, Mr. Chief Justice, Counsel. Just a couple of quick questions. Do you agree that every member of the class has to have standing? Yes, Your Honor. I'd like to explore something just briefly. Let's assume that in this case that your client received a summary of his rights on day one on a Monday, and the company admits that it inadvertently sent that out, immediately corrects it the next day with an explanation. So you have the two letters again with complete information. Would you have a claim? You would have standing to bring a claim, Your Honor. I think you would lose on the merits on the grounds that there's no harm. But the question in this particular case is whether these two letters sent at different times with different disclosures satisfy the statutory purposes. And even the drafter of these letters, an employee of TransUnion, testified at trial that there was confusion created here, as was the testimony of Mr. Ramirez. So you would have standing, even though there's certainly – it doesn't appear to be any intention to deceive, no intention to send you the wrong letters and a total correction of the problem or an explanation at least. Intentionality would come in on the damages side, and the statute is quite clear that it is the willfulness of the defendant that gives rise to a claim for statutory damages. So in this case, I think that there would be standing, but there would be no remedy available. It would probably go to the redressability side, not the injury in fact side. So you mentioned damages. That leads me to this question with respect to typicality. Here, obviously, there's statutory damages involved, so that makes it less difficult from my standpoint. But what if the damages available here are actual damages? Would that change the typicality analysis? It would, Your Honor, because the typicality analysis at that point would turn on the proven harm to the individual and the consequences of it. In that situation, there would be difficulty for class certification, let alone for the calculation of damages. So you think that it would really jeopardize your petitioner's or respondent's chance of being typical of the class? Not typicality, Your Honor, because the typicality goes only to the claims. It would compromise predominance. It would compromise perhaps the adequacy of representation. But so long as the claims asserted themselves, as this court said in Falcone, that is what typicality has to ensure. Thank you. Justice Breyer? Well, you want to say anything additional on that point? What I think must have come up often or fairly often in class cases where damages differ, but there are the issues that you say that are the same, is someone goes in and tries to testify about the extra damages that he suffered, the higher, higher prices, or the many more widgets that they were charged on, or the special bad treatment he got in some hospital, et cetera. And the other side, I should think, would be able to object, either that it's relevant. Something like it's relevance is small compared to the harm it's going to do to our case where these damages are not really very typical. They're especially egregious. That will prejudice the jury. But am I on the right track there, the wrong track? What's actually happened? I think you are on the right track, Justice Breyer, and I would have two responses. The first is simply that centuries of experience with the trial practice has led the federal rules of evidence to address exactly the questions Your Honor is asking about through Rule 403, the ability to object that testimony is more prejudicial than probative, but also places a burden through Rule 103 on the objecting party to clarify the issues before the trial court  More broadly, I would say that if you look at the mechanics of class certification and the requirement under Rule 23C that it be done as early as practicable, at this point, at the point of class certification, it's unlikely that anyone has any idea what the nature of the trial testimony will be. When petitioners saw 23F review in the Court of Appeals, it did not address the typicality point. It tried to disqualify Mr. Ramirez, not because he was too strong, but because he had no claim. They said that he had dissembled in his application, they said that he had no damages, and they tried to disqualify him on summary judgment on the same basis. It's only upon the retelling of an appeal that Mr. Ramirez emerges as hungarian. There was no evidence before the district court at the time of certification that there was anything atypical in the strength of Mr. Ramirez's claim. Thank you. Justice Alito? Let's assume that TransUnion has a computer program, as I assume they did, that will flag anybody whose first name and last name corresponds to someone who is on this list. Do you think that everybody who would be flagged if there were any sort of inquiry has suffered injury in fact, even if there never was an inquiry regarding that person? I think they have under this court standard in Spokane. There was certainly material risk. Mr. Clement relies heavily on the 75% number, but the fact is that one quarter of the class had their files accessed by one subset of potentially accessing parties within only seven of the 46 months of the class period. So there is material risk here, but I think it goes beyond that, Justice Alito, that the testimony at trial was that over 98% of the people on the OFAC list are foreigners. They are not American citizens. The class was only American. Let me interrupt you to try to get an additional question. One of the things we look for in determining whether there is Article III standing is whether there is any common law analog, whether this was the kind of case  that occurred at the time of the adoption of the Constitution. What is the closest case you can think of where a suit could be brought to recover for having been subjected to a risk in the past, even though the person had no knowledge that the person had been subjected to that risk? I think that at defamation per se, at common law, there was no requirement that the actual party testify to his knowledge of the risk. The question was whether there was dissemination of information of the sort that would cause damage. And here, under the facts presented, there are people like landlords who routinely check your credit files. Most Americans have no idea when their credit files are being accessed. And so this is an imposition that would not have been recognized as common law. Suppose in 1786, someone was getting ready to publish a newspaper article defaming me. I had no idea that this was going to happen. And just before this article was published, the owner of the paper said, no, we're not going to do that. And so it never was published. Would I have been able to sue for defamation in that situation? Because I was at a serious risk at some point in the past of being defamed. But it never eventualized, and I didn't even know that I was at risk. No, Your Honor. In that case, there would have been absolutely no risk of publication. It would have been Mr. Clement's desk drawer analogy. However, there's a difference between that and being on readily accessible computer files that are downloaded on a routine basis. We have evidence in the record millions of times per month. Thank you. Justice Sotomayor? Counsel, would you give me your best answer to both Mr. Clement and the government with respect to the typicality issue on the degree of harm in this case? Both of them believe that under 23A, that typicality often has to address whether your damages claim are common to the class in some way. So give me your best answer. There has been decades of experience under Rule 23A3, and there has never been a requirement of identity of damages among all class members. In fact, when Congress passed the PSLRA and determined that it would be best for the class to have the strongest claimant take the lead, there was no need to modify Rule 23 or in any other fashion change the substantive law of class certification. We have had experiences, as Justice Breyer suggested, with antitrust cases where somebody bought 1,000 times as many widgets as someone else, and that does not alter whether the claims or defenses are the same as are being asserted by the rest of the class. There is no basis for distinguishing in the legal claims that are being asserted. There are questions, of course, about whether there can be common answers to the common questions, as this court determined in Dukes v. Walmart, or there can be questions as to predominance. Thank you, counsel. Justice Kagan? Mr. Zakharoff, I get the harm from your procedures claim, but I'm wondering if I could press a little bit more on the disclosure claims. I mean, what Mr. Clement says about those is that your clients are complaining about receiving two envelopes in the mail rather than one. Why isn't that the right way to look at this, that this is really a sort of no harm, no foul situation? I believe that that's a factual question, Your Honor, and if indeed it was just two envelopes and it was just a mistake as to the mailing, that may mitigate any kind of disclosure claim. But the evidence presented to the jury here, and these were factual determinations as to the willful violation of the statute by the jury, the evidence presented to the jury was that these were confusing, not just as to Mr. Ramirez, but the drafter of the letters testified to that as well, and that they did not serve the statutory purpose of giving the disclosure in a form that was tied to the specific risk of being on an OFAC match list. And just thinking about what a material risk is, a material risk of harm, as Spokio described it, what do you take that to mean? I mean, how likely does a risk have to be? Of what kind of harm are we talking about? How should we think about that standard that we set out? Well, Spokio runs together a number of different analytic strains, and I think that if you look at the cases that Spokio addressed and relied upon and the cases that have been decided by this court more recently, like Brownback and Usablenum, I think that what you have is a divide between completed harms and injunctive relief. Injunctive relief, a party has to establish standing in a more exacting way. I think that's one of the conclusions of Lewcott. It makes a difference whether the claim is a facial challenge to a statute or an applied application to the particular claimant. And most significantly, I think it makes a difference whether these are generalized claims of the public at large or private claims or private endowments of the right to sue by Congress. So I think that the answer to your question, Justice Kagan, is that Spokio looks at all of these in the material risk of harm and trying to determine whether there's a sufficient allegation of actual injury. As we said in our brief, it may be better to disaggregate them and to focus primarily on whether these are private versus public rights, because that's a simpler analytic divide that helps explain the outcome in all of this court's cases. Thank you. Justice Gorsuch? Counsel, in your brief, at least, you seek to suggest that the 6,332 class members have standing in part because there was publication of their information, at least within TransUnion and its agents who print out information for them. And I guess my first question for you is, does that pose a problem in light of our intracorporate conspiracy doctrine that normally suggests what happens within a corporation doesn't count for purposes of conspiracy and you need to have somebody outside of it, outside of it and its agents? And isn't it odd to speak of publication within a company? Your Honor, we were in that section of the brief addressing the question from Spokio whether there was a common law analog to what happened here. All we were arguing was not that this was the basis of recovery, but rather that the common law did recognize intracorporate communications as a form of publication and that was carried forward in Restatement I and Restatement II. Our claim for recovery and for harm is a statutory one, and so the question is whether Congress created the private right of action. I understand that point. I was just trying to clarify the first one. And I guess on that, my follow-up to you is, would that view of defamation law allow for individuals to sue newspapers and other media outlets who've shared false information internally but not actually published it externally? There are common law precedents for that, Your Honor, because if it's communicated… Do you endorse that view of the law? We don't think it has any bearing on the outcome of this case, Your Honor. So this whole argument, we should just ignore that? No, the argument is to show that Congress was legislating against a proximate common law baseline, an argument that had to be addressed in light of Spokio. Thank you. Justice Kavanaugh? Thank you, Chief Justice. Good morning, Mr. Sakharov. I think you have a good argument with respect to the 1,853 in terms of the reasonable procedures, but I'm more concerned about the 6,332 whose information was not, in essence, published. In Spokio, of course, the information was published, which is a big distinction, as I see it, between that case and this as to the 6,332. And when Spokio talked then about risk of harm, it was talking about harm beyond the publication, at least as I understood it, for example, publication of zip codes, which strikes me as a very different thing than talking about risk of harm when there hasn't been publication to begin with. So that's point one. And then on risk of harm, you've heard me talk about damages versus injunctive relief. It strikes me that risk of harm, of course, is enough to get you injunctive relief with damages. I hadn't thought risk of harm would get you damages standing for damages claims unless the risk of harm was itself a harm. Judge Tatel on the D.C. Circuit analogized that if inaccurate information falls into a database, does it make a sound? And his answer to that, applying Spokio, was no. And I guess then-Judge Barrett, talking about no harm, no foul, seemed to be picking up on the same thing. So can you respond to the distinction between this case and Spokio and then try to help me on risk of harm for the 6,332? Yes. Briefly, the distinction between this and Spokio is that this is not a zip code or marital information, but this is a serious allegation which prevents individuals from being able to transact at all. But it hasn't been published, unlike in Spokio. That's the second prong of this, which is the publication. And we think that that's a fact record. We think that under Spokio, material risk establishes the standing. And then the question is whether there has been publication, which would be an element of the offense. And I think that the evidence here is that with regard to the other 6,000, that there was circumstantial evidence, given the limitations on what the defendant provided to us. I would direct your honors to- In Spokio, though, I think there's different language in there, of course, and we have to figure that out. But I thought the publication itself was the key demarcation that helped support standing there, and you don't have that here for the 6,332. If you can continue your answer to that. The court remanded in Spokio to determine standing given the quality of the injury asserted, and so the publication was not enough to get over the hurdle. And I don't think that at any point in Spokio the court said that it was by itself a necessary condition. But even assuming the burden of publication, if the court's attention could be directed to Joint Appendix page 104, where TransUnion did an internal audit of its OFAC claims and found that in one month in July 2012, which is still within the statutory period, within the class period, there were over 17,000 OFAC alerts sent out. All of the class members were still on the list at that time, and so you have a situation where a jury could reasonably infer, given the limitations on what TransUnion was able to generate from its files, that there was indeed publication at all. Thank you very much. Justice Barrett? Good morning, Mr. Zakharoff. I have a question about whether you can ever have a bare procedural violation with respect to any of these consumer protection statutes like FCRA or the FDCPA. May all of them have procedures that are designed to protect against a risk of harm? So whether it's to have information put clearly on two pages instead of one, or whether it's to say that certain things must be in writing, or whether it's, I'm thinking of many of the cases that the lower courts have dealt with, not having so many numbers of your credit card number reflected on a receipt. All of these are designed to protect a consumer against the risk of some harm. So is there any violation that you can think of? I'm not talking about the disclosure here. I'm not talking about the regional procedures claim and the disclosure of private information. I'm talking about these procedural guardrails like this. Is there anything that you can think of that would count as a bare procedural violation that's not cognizable under Spokio? I think Spokio leaves that question open, Your Honor. I think that the best answer should be that if it is trivial, if it would not have a common law analog because of the nature of the disclosure, the nature of the procedural violation, that the court could reject it as a matter of standing. It remains to question whether the court is best off handling these as standing matters, meaning that the individual would then be free to file in state court or should handle it as a matter of part of the injury in fact and necessary as part of the statutory standing and then simply rule against the plaintiff on the merits. So then is it your position that the reason why they were standing for these things coming in the two envelopes and the OFAC envelope not having the specific information that was included in the first credit report, is it your position that the reason why that's not a bare procedural violation as opposed to something else you didn't give an example but something you say would be trivial, is it because of it being inherently shocking and confusing like the Ninth Circuit said? Is that what distinguishes it? That is part of what distinguishes. It is also the fact that they were called out on exactly these types of procedures by the Third Circuit and Cortez. But that doesn't have anything to do with whether the plaintiff was injured. That might bear on how egregious TransUnion's behavior was, but that doesn't bear on the injury, right? It bears on the injury on the willfulness claim for statutory damages. But not the concreteness, right? No, not the concreteness of the individual plaintiff. That's correct, Your Honor. Okay. Thank you very much. A minute to wrap up. Mr. Eisencroft? Thank you, Your Honor. The concern in this Court's Article III cases is protecting the domain of Congress. Never has this Court found Article III to remove jurisdiction for retrospective damage claims when Congress has created the private cause of action, vested the affected individuals with the right to bring suit, and then provided for statutory remedies to those individuals. It is difficult to imagine a fact pattern more at the heart of the statutory zone of interest or one that is more uniform across the class. There are only a total of 6,000 people on the OFAC list, and over 98% of them are foreigners. Yet there are 8,185 class members. These are all Americans. The terrorists or drug kingpins on the OFAC list are not the people who apply for credit at Home Depot. The name match system used here yielded not one Sergio Ramirez in the class but three, not to mention 99 people named Maria Hernandez. All were listed improperly. Ramirez's claims are not only typical of the other Sergio Ramirez's but are identical to a group put in harm's way by TransUnion's uniform course of conduct. Thank you, Your Honor. Mr. Clement. Thank you, Mr. Chief Justice, and may it please the Court just a few points in rebuttal. First, on falsity, it's interesting to hear the government to say that reporting this as a potential match is false because if you go to the OFAC website today and type in the respondent's name, you will get a hit. And so they think it's good enough for the government. I guess they hold TransUnion to a higher standard. The government also said that the information need not be false for there to be a statutory violation. And that's actually an important point because if that's their position, that kind of destroys the analog between the statutory violation and the common law violation, which is a point Justice Scalia made at argument in the Spokio argument. If I can move now to standing. On standing, I think that Respondent's Counsel correctly answered the Chief Justice's hypo, at least under Respondent's view, that a material risk is enough under Spokio. But if a material risk is enough and the answer to the Chief Justice's hypo is, that's right, everybody can bring actions for traffic violations that didn't actually realize themselves in any harm. I mean, the Article III courts could be open to all sorts of trivial injuries where everybody should be essentially toasting their good luck, not suing the person who posed a risk to them but didn't actually injure them. Another point on standing, I think it is worth recognizing why this issue is so important, is there are people in our system of government who do get to pursue violations of federal statutes without suffering injuries in fact. They are called prosecutors. But if you're going to give a cause of action to an individual under our system, they can only actually bring that claim into federal court if they have suffered injury in fact. On typicality, I want to make two points about that. First is typicality is required at the outset of the case because the class representative's typicality is important from the beginning. It's not just a trial issue. The defense has the right to depose the class representative. So from the very beginning of the case, the class representative is essentially the embodiment of the case. It is true I suppose it's a technical matter that the class representative doesn't have to testify, but in practice they do, and that's why having an atypical class representative is a bad idea from the beginning. The antitrust cases are different, Justice Breyer, and they are different in an important way because it starts with the predominance question at the beginning of certification. In an antitrust case or a securities case, people will say, well, the individualized issues of damages will predominate. People will say, no, we can deal with it with some kind of claim processing issue, and then the damages issue isn't that important. But in a statutory damages case, particularly one seeking punitives, at the predominance issue, what the plaintiffs say is, don't worry. We have one-size-fits-all statutory and punitive damages here, and then they turn around and say we're going to find the least typical class representative we can. That's an abuse this court has to stop. The other point I would make about this, and this is really where the standing and the typicality arguments come together. If it really is going to be the case that you can have standing just by suffering a material risk and you don't actually have to have the injury realized, then having somebody who suffered a real injury risk and had it materialized on them is a very atypical class representative for a class of people who only suffered a material risk. And the last thing I'll say is... You can say your last thing. Counsel? I'm sorry. I may have exceeded my time, in which case... Thank you, counsel. The case is submitted.